# APRIL, 1941

WELLINGTON OIL COMPANY OF DELAWARE V. NICK A. MAFFI.

No. 7745.   Decided April 2, 1941.
(150 S. W., 2d Series, 60.)

202

*Terrell, Davis, Hall & Clemens, Ernest W. Clemens* and *George M. Luhn,* all of San Antonio, for plaintiff in error.

A verbal contract which is not to be performed within the space of one year is unenforcible because it is in violation of the statute of frauds, and a part of a contract which is entire and not divisible which comes within the statute of frauds is unenforcible as a whole. Cheney v. Coffey, 131 Texas 212, S. W. (2d) 162; Paschall v. Anderson, 127 Texas 251, 91 S. W. (2d) 1050.

A principal, whether a corporation or natural person, is not charged with notice which comes to agent, unless at the time said agent received the notice he was acting for his principal. Teagarden v. Godley Lumber Co., 105 Texas 616, 154 S. W. 973; Texas Loan Agency v. Taylor, 88 Texas 47, 29 S. W. 1057.

*J. B. Lewright* and *Grady Barrett,* both of San Antonio, for defendant in error.

In reply to plaintiff in error's propositions defendant in error cites: Dargan v. Keystone Mills Co., 126 Texas 80, 86 S. W. (2d) 627; Caller Times Pub. Co. v. Chandler, 134 Texas 1, 130 S. W. (2d) 853.

MR. JUDGE HICKMAN, of the Commission of Appeals, delivered the opinion for the Court.

Nick A. Maffi was plaintiff in the trial court and Wellington Oil Company of Delaware, hereinafter sometimes called Wellington, and John T. O'Neil, its president, were defendants. Upon a verdict returned in obedience to a peremptory instruction, judgment was rendered in the trial court that plaintiff take nothing. That judgment was reversed by the Court of Civil Appeals and the case remanded. 138 S. W. (2d) 134. In view of the instructed verdict, the Court of Civil Appeals in its opinion very properly stated the facts from the viewpoint most favorable to Maffi. We find that its opinion contains a clear, consise and fair statement of the case from that viewpoint, and no reason is perceived why we should undertake to restate it in different language. We, therefore, adopt that statement, which is as follows:

"It appears from evidence sufficient to raise jury issues that in the spring of 1935 Mrs. Driscoll authorized Maffi to procure descriptions of her lands and solicit offers from third parties to lease them for oil and gas purposes. The lands were embraced in several ranches, including the La Gloria, the Palo Alto and the Sweden. Maffii procured the descriptions, marked them on maps, and otherwise familiarized himself with the situation and status of the properties. He laid this information before O'Neil, who was acting for Santa Clara Oil & Gas Company, of which he was president and general manager, and who was seeking leases for his company. On Maffi's representations, O'Neil became interested in the Driscoll properties. He had never met Mrs. Driscoll, to whom, it seems, business approach from strangers was difficult. Maffi offered this approach, and it was agreed between the two men that Maffi would give O'Neil a friendly introduction to Mrs. Driscoll, in order to enable the latter to deal personally with her for leases, and that the two men would work together to that end. It was known to them that Mrs. Driscoll would not pay any brokerage commission upon leases to be sold by her. It was agreed, then, that such commission would be exacted of lessees, and O'Neil further assured Maffi that he would "treat him right," and "take care of him" on leases resulting from their joint efforts.

"In pursuance of this agreement, which was wholly in parol, Maffi brought Mrs. Driscoll and O'Neil together, and under Maffi's recommendation Mrs. Driscoll dealt directly with O'Neil, as well as with Maffi. Those dealings resulted in Santa Clara Oil Company's procuring leases, first, upon the La Gloria Ranch, and, second, upon the Palo Alto. For his services in these transactions the Santa Clara Company paid Maffi a cash brokerage

fee on each of the two leases. All this occurred in the spring and early summer of the year 1935.

"Now, the Sweden Ranch was not then subject to lease, for the reason that a lease thereon was under option to Continental Oil Company, the exercise of which option was not subject to termination until several months later, and although it was said Mrs. Driscoll was not "satisfied" with the contract for that option, or with performance thereunder, there were no negotiations concerning that Ranch between Mrs. Driscoll, Maffi, O'Neil or his Santa Clara Oil Company, at that time. About a year after its lease of La Gloria and Palo Alto Ranches, Santa Clara Oil Company, for which O'Neil was acting, sold and transferred all its physical assets to Wellington Oil Company of Delaware, a Delaware Corporation, for a consideration of 375,000 shares of Wellington capital stock issues to stockholders of Santa Clara Company. And O'Neil became president and general manager of the Wellington Company, as he was of the Santa Clara Company. Both corporations had other, but not all, officers and stockholders in common. Wellington had from 400 to 600 stockholders, Santa Clara, nine. The record is silent upon the provisions of the contract by which Wellington acquired the assets of Santa Clara; specifically, it does not show what provision, if any, was made in said contract looking to the assumption of, or reservation against, liability for the outstanding contracts and obligations of the Santa Clara Company.

"The record discloses that after procuring leases for Santa Clara Company upon Mrs. Driscoll's La Gloria and Palo Alto Ranches, in the early summer of 1935, Maffi and O'Neil had no further active dealings together. The record further shows, however, that two years later, in June, 1937, O'Neil, ignoring Maffi, privately effected a lease to Humble Oil & Refining Company to Mrs. Driscoll's Sweden Ranch, on which, in the meantime, inferentially, the option previously held by Continental Oil Company had been allowed to lapse. Humble Company paid Mrs. Driscoll a cash consideration of $115,745 for the lease. Some two months after the Humble Company secured the lease on the Sweden Ranch, that Company assigned a 1/64 overriding royalty interest therein to appellee Wellington Oil Company of Delaware, as a brokerage fee for procuring that lease. It is that brokerage fee that is in controversy here.

"Maffi brought this suit against O'Neil and Wellington Oil Company of Delaware, contending that the lease of the Sweden Ranch to the Humble Company of June, 1937, was made by virtue and in pursuance of his parol agreement with O'Neil, in the spring of 1935; that in that agreement O'Neil was acting

for Santa Clara Oil Company and therefore bound that corporation to pay Maffi a broker's commission upon said lease; that by purchasing all Santa Clara Company's assets in 1936, appellee Wellington Oil Company of Delaware assumed, as a matter of law, to perform all existing contracts of Santa Clara Company and particularly the latter's obligation to pay him a brokerage fee upon the sale of the lease upon the Sweden Ranch to the Humble Company whenever and to whomsoever it was consumated. Maffi prayed for judgment for one-half interest in the 1/64 overriding royalty acquired by appellee Wellington Company from the lessee, Humble Company, or, in the alternative, for a reasonable cash commission on said lease, which he placed at $18,000."

Writ of error was granted upon an assignment representing the question of law that Wellington Oil Company was not charged with notice of transactions had between its president, O'Neil, and Maffi before it was organized and hence before O'Neil became its president or agent, since such knowledge was not, and could not have been acquired in the transaction of its business. Before discussing that question, we shall consider the other questions presented in the application.

■ We agree with the holding of the Court of Civil Appeals that the parol agreement between Maffi and O'Neil made in 1935, as it affected the lease from the Sweden Ranch to the Humble Company, was not within the statute of frauds denying enforcement of parol contracts, not performable within one year. According to Maffi's testimony the option held by the Continental on that ranch was due to expire within 6 or 7 months from the date of his contract with O'Neil. It is clear, then, that the whole contract, as between both of the parties, was capable of being performed within one year. Such contracts do not come within the prohibition of the statute of frauds. In addition to the authorities cited by the Court of Civil Appeals in support of this conclusion, we cite the following: Weatherford, etc. Ry Co. v. Wood, 88 Texas 191, 30 S. W. 859; Kennedy v. McMullen, 39 S. W. (2d) 168 (error refused); Hatzfeld v. Walsh, 120 S. W. 525 (error refused).

■ If Maffi is to recover anything in this case it must be upon his alternative plea for the value of his services. While in his petition he prays for a one-half interest in the 1/64th overriding royalty acquired by Wellington from the Humble Company, yet the allegations of his petition are wholly insufficient to set up an oral contract for the future joint acquisition of lands.

He alleges no specific contract between himself and O'Neil, whereby any property received as a commission for effecting a lease of Mrs. Driscoll's land would belong jointly to him and O'Neil and clearly he alleges no such contract with Wellington. On the contrary, he alleges that there was no specific agreement between him and O'Neil with reference thereto, and relies upon a custom to fix the proper compensation which he is entitled to receive. No trust in after-acquired real estate results from a contract so indefinite in its terms as to the exact interest which should be held in trust. 42 Tex. Jur., p. 697, Sec. 83, and the authorities there cited, to which we add Wright v. Wright, 134 Texas ·82, 132 S. W. (2d) 847.

■ The question of whether or not Maffi's testimony was sufficient to make an issue of fact on his claim of compensation on the quantum meruit for the value of services rendered, is based upon an unusual fact situation. His testimony is not altogether clear, but, in view of the peremptory instruction against him, it is sufficient, we think, to raise the issue that he had a contract with O'Neil whereby, should commissions be earned from future lessees of Mrs. Driscoll's lands, he should receive a part thereof. In one place he testified that his part was to be one half. O'Neil and Santa Clara recognized that Maffi's services were valuable in connection with the procurement of other leases from Mrs. Driscoll as evidence by the fact that the latter paid substantial sums therefor. It cannot be held, as a matter of law, that his services were not valuable in connection with the negotiation of the lease of the Sweden Ranch to the Humble Company, through which transaction Wellington acquired the 1/64th overriding royalty. According to Maffi's testimony, Mrs. Driscoll would not have dealt with O'Neil in the first instance had he, Maffi, not made arrangements with her to see him and had he not introduced them. His testimony is also to the effect that he had a contract with O'Neil for compensation for his services should future leases be executed by Mrs. Driscoll through O'Neil and a commission paid by the lessees. Had O'Neil himself received this overriding royalty, there could be no question but that an issue of fact was raised as to the right of Maffi to compensation. Admittedly, Maffi rendered no direct service to Wellington; it came into existence after his services were rendered. But we have concluded that if Wellington, O'Neil's principal, with knowledge of Maffi's services, and with knowledge of the fact that he was expecting remuneration therefor under his contract with O'Neil, accepted the benefits thereof, then he has a cause of action against it on

the quantum meruit, even though there existed no contract between him and Wellington. Colbert v. Dallas Joint Stock Land Bank of Dallas, 129 Texas 235 and 102 S. W. (2d) 1031.

■ This brings us to a consideration of the question upon which the application for writ of error was granted, that is whether Wellington was charged with knowledge acquired by O'Neil in his transactions with Maffi when he, O'Neil, was representing Santa Clara, and at a time before he became the president and representative of Wellington. Upon this question there cannot be said to be a uniformity of decisions. The rule recognized in most jurisdictions appears to be that announced in Section 276 of the American Law Institute's Restatement of the Law of Agency, as follows:

"(a) Relevant knowledge may have been acquired by the agent before the time of his employment or after he becomes agent, either while acting for himself or for the principal. In any case, except where the knowledge is acquired confidentially (see sec. 281), the important matter is not how the agent acquired it, but whether or not he has the knowledge at the time when it becomes relevant in his work for the principal. If he has the information in mind, the principal is bound, under the rule stated in this Section, equally where it was not acquired because he was acting as an agent, as where he obtained it as such agent * * *."

The same principle is announced, in substance, in 19 C. J. S., Corporations, secs. 1082 and 1083; 2 Am. Jur., Agency, secs. 375 and 376; 13 Amer. Jur., Corporations, sec. 1111.

This Court has not adopted so broad a statement of the rule. The rule has been announced by this Court that a principal, whether a corporation or a natural person, is not affected by notice which comes to the agent or officer unless such knowledge came to him while he was transacting the business of his principal. Texas Loan Agency v. Taylor, 88 Texas 47, 29 S. W. 1057; Teagarden v. Godley Lumber Co., 105 Texas 616, 154 S. W. 973. While this Court has announced that as the general rule, it has in subsequent decisions recognized an exception thereto which seems also to be recognized in practically all jurisdictions. That exception is that where the agent is the actor (sometimes designated sole actor), representing his principal in the transaction to which his knowledge relates, the principal will not be permitted to avail himself of the benefits of his agent's services without being charged with his knowledge. Mays v. First State Bank of Keller (Com. App.),

247 S. W. 845; National Fire Ins. Co. of Hartford v. Carter (Com. App.), 257 S. W. 531; Fire Ass'n. of Philadelphia v. LaGrange & Lockhart Compress Co., 109 S. W. 1134 (Error ref.) ; Wilcox v. Dillard, 3 S. W. (2d) 507 (Error ref.) Lavaca Petroleum Cor. v. Runk, 111 S. W. '2d) 1113 (writ dismissed by agreement).

In the case of American Surety Co. v. Fenner, 133 Texas 37, 125 S. W. (2d) 258, this court imputed to the principal knowledge which came to one of its agents who represented the principal in the transaction to which the agent's knowledge related, notwithstanding some of that knowledge came to the agent while he was an officer of, and acting for another company. The case is distinctly in point here.

A rule which would permit a principal to profit by a transaction of his agent without at the same time charging him with relevant knowledge possessed by his agent at the very time he carried on the negotiations would be, to our minds, indefensible. In the instant case if the testimony of Maffi is to be believed, O'Neil has acquired for his principal, Wellington, a valuable piece of property. He could not have acquired same but for the services of Maffi. In negotiating the transaction under which that property was acquired, O'Neil was the sole actor for Wellington and knew at that time that Maffi had rendered services which made it possible for him to acquire this property for his principal, and that Maffi rendered such services under an agreement for compensation. Upon reason and the above cited authorities, we hold that Wellington must be charged with the knowledge possessed by O'Neil at that time. The conclusion of the matter is that the evidence raised issues of fact on Maffi's claim for compensation for services rendered, and that the trial court erred in peremptorily instructing the jury against him.

Accordingly, it is our order that the judgment of the Court of Civil Appeals, which reverses the judgment of the trial court and remands the case thereto, be affirmed.

Opinion adopted by the Supreme Court April 2, 1941.