GOODWIN et al. v. SOUTHTEX LAND
SALES, Inc., et al.

No. 12303.

Court of Civil Appeals of Texas.
San Antonio.

Sept. 19, 1951.

Rehearing Denied Nov. 21, 1951.

Hill, Lochridge & King, Mission, for appellants.

Strickland, Wilkins, Hall & Mills, Mission, for appellees.

NORVELL, Justice.

This is a suit for damages for breach of a contract, partly in writing and partly in parol, under which appellees, Southtex Land Sales, Inc., and Mrs. Mary O'Brien Shary, independent executrix of the estate of John H. Shary, deceased, allegedly agreed to purchase 40,000 budded citrus trees from appellants, Ray D. Goodwin and Eugene M. Goodwin, who were doing business as Ray D. Goodwin Nurseries.

After appellants, as plaintiffs below, had completed their case, the appellees also rested and made a motion for an instructed verdict which was overruled by the court. The case was submitted to a jury upon special issues. The jury's answers were in the main favorable to appellants' contentions, but after due notice and hearing the court concluded that a peremptory instruction should have been given, and rendered judgment for appellees non obstante veredicto.

The case is before us upon three points asserted by appellants and seven cross-points of appellees, presented in accordance with the provisions of Rule 324, Texas Rules of Civil Procedure.

The controlling questions presented by said points and cross-points are:

1. Was appellants' claim barred by the statute of frauds? Article 3995, § 5, Vernon's Ann.Civ.Stats., relating to agreements not to be performed within one year.

2. Was appellants' claim barred by the statute of limitations? Article 5526, Vernon's Ann.Civ.Stats.

3. Did appellants establish a proper measure of damages?

4. Was the evidence sufficient to bind the executrix of the John H. Shary estate?

Special Issue No. 4 and the jury's answer thereto were as follows:

"Do you find from a preponderance of the evidence that during the month of

March, 1946, the plaintiff Ray D. Goodwin entered into an agreement with the defendant Mary O'Brien Shary, as independent executrix of the Estate of John H. Shary, deceased, acting through Roy K. Straw whereby in substance it was agreed that plaintiff would bud 40,000 citrus seedlings in varieties designated by said defendant and said defendant when said trees achieved the size of 5/8ths to 3/4ths inches would pay $1.50 per tree to and accept delivery of said trees dug and balled by plaintiff Ray D. Goodwin?

"Answer yes or no as you find the facts to be.

"We, the jury, answer Yes."

An affirmative answer to a similarly worded issue (No. 7) relating to Southtex Land Sales, Inc., was also returned by the jury.

Ray D. Goodwin testified that he had furnished numerous citrus trees to the John H. Shary interests or the John H. Shary estate prior to March of 1946, when he entered into negotiations relating to his delivery of further citrus trees for transplanting. The Shary interests desired 40,000 trees of the following varieties: Red Blush grapefruit, 10,000; Valencia oranges, 10,000; Norris or Hamlin oranges, 10,000, and Marsh Pink grapefruit, 10,000. Goodwin requested an advance deposit of $7,500 in view of the order for Marsh Pink grapefruit trees, as he believed this variety was not readily salable upon the market. The Shary estate was involved in settling an estate tax liability to the federal government, and rather than make the suggested $7,500 deposit agreed to accept Red Blush grapefruit trees instead of Marsh Pinks. Goodwin also was definite in his testimony that Straw, acting for the Shary interests, agreed without qualification to take 40,000 trees. He also testified that it was agreed that the trees should be delivered and accepted when they attained a five-eighths to three-fourths of an inch in diameter at a point two to three inches above the bud.

On March 18, 1946, Straw wrote the following letter to Goodwin:

"John H. Shary
"Texas Lower Rio Grande Gulf Coast
 Lands March 18, 1946.
"Mr. Ray D. Goodwin
 Mission, Texas
 Dear Ray: In Re:Budding of citrus stock.

"Referring to our conversation of yesterday, we wish to change the manner of budding 40,000 seedlings as set out to you in our letter of March 2, 1946, which are now to be budded as follows, with no advance payment being required.

"Red Blush Grapefruit...... 20,000
"Valencia Oranges ......... 10,000
"Hamlin Oranges ........... 10,000

"As trees are balled in your nursery, we prefer to have them balled in burlap; however, when we get to taking the trees that will be planted immediately as balled, and weather conditions permitting, we will try to take some of them balled in paper. Mr. Casey will work this matter out with you as he plants the trees.

"During extreme dry and windy weather, it is not practical for us to take and plant trees unless they are balled in burlap.

"Hoping the above is according to our agreement and understanding, we are

 "Yours very truly,
RKS/vdw John H. Shary Estate
c.c. By: /s/ R. K. Straw"

Goodwin testified that he commenced budding immediately after receipt of this letter. He explained that all commercial citrus trees in the Lower Rio Grande Valley are grown on sour orange root stock. Seedlings are small sour orange trees and they are budded by inserting a bud or a sprig of bud wood from another tree into the seedling. After the bud has commenced to grow, the sour orange shoot is cut back and the bud wood then grows into the top of the tree nourished by sour orange roots. The species of the bud determines the variety of the fruit that will be produced.

According to Goodwin, he budded 80,000 seedlings located on Lot 23, Block 5, of the Goodwin tract subdivision. As to when these trees would have grown to five-eighths of an inch in diameter, said appellant testified as follows:

"Q. Did you bud as many or more than the varieties mentioned in that letter

(Straw's letter of March 18, 1946)? A. Yes, sir, I budded for myself, I budded the rest of them to be used in the regular nursery business.

"Q. Would it have been possible for those trees to have reached 5/8 inch if budded at the time that contract was made, would it have been possible to deliver 40,000 trees of the varieties set out within a year? A. Yes.

"Q. Would it have been possible had you delivered no trees under 5/8 inch, would that have been possible? A. Yes."

He also testified:

"Q. Did I understand you to say on direct examination that all of these trees were ready for delivery in the fall of 1946? A. Just enough for their contract, I budded about 80,000 trees and there were about 40,000 of them.

"Q. In the fall of 1946? A. That is right."

■ Under the jury finding as to the provisions of the contract between the parties, appellees were obligated to accept delivery "when said trees achieved the size of 5/8ths to 3/4ths inches and pay $1.50" therefor. According to Goodwin's testimony, the trees achieved the size stipulated in the contract before the expiration of one year. Goodwin's testimony upon this point was not contradicted. Even if it be considered that the issue of his credibility was involved, there was no issue submitted to the jury with reference to the pleaded defense of the statute of frauds and such defense is consequently waived unless same was established as a matter of law. Wichita Falls & Oklahoma Ry. v. Pepper, 134 Tex. 360, 135 S.W.2d 79.

Appellees' contention that the action is within the statute of frauds seems to be based upon the fact that appellants pleaded that the contract was "partly in writing and partly by parol," consisting of a letter written by R. K. Straw, dated March 18, 1946, "and an oral promise by Straw that defendants (appellees) would take the trees at $1.50 each, together with the prior course of dealing and acceptance below described."

It was then alleged that plaintiffs had theretofore sold citrus nursery stock to appellees on the following terms: "The trees so sold were delivered to defendant at the nurseries of plaintiff Ray D. Goodwin where such trees were grown and when such trees were of size of 5/8 inch to 3/4 inch (diameter of trunk two inches above bud); said trees were delivered 'balled' (that is, its roots and the earth in which the roots were imbedded were bound and tied in a ball with burlap and twine), and defendants made payment at the rate of $1.50 for each tree so delivered, which amount was paid for each month upon the rendition of a statement by plaintiff Ray D. Goodwin to defendants."

In connection with evidence relating to a prior course of dealing between the parties, appellants offered a letter dated December 10, 1945, signed by Ray D. Goodwin, which, according to Goodwin, related to a prior and different contract than the one here involved. The letter speaks of 30,000 seedlings which, "if and when budded, should grow and become of size 5/8 of an inch or larger and be ready for planting at intervals on or before June 1, 1947." The letter further states that "you may have the option to purchase all the balance of the citrus nursery trees I may produce from these nurseries, to be taken by you on notice from me as such trees become 5/8 of an inch, with the understanding that I will deliver the trees to you dug and balled in the nursery at the price of $1.50 per tree, to be paid for at such price as the trees are delivered."

■ As we understand appellants' petition, it does not assert that the agreement of March, 1946, adopted all the provisions of the prior agreement to which the letter of December 10, 1945, has reference. The petition refers to a "prior course of dealing and acceptance below described," followed by allegations relating to the method of balling, delivering and paying for the small citrus trees. Nothing is pleaded about an option agreement nor about trees maturing on or before June 1, 1947. The letter was admissible to show the practice of balling and delivering trees which had

been followed by the parties, but it can not be taken as establishing a contract at variance with appellants' pleadings.

■ Appellees assert that appellants can not recover because the contract was made on March 18, 1946, but was not performable until "on or before June 1, 1947." The jury did not find that the contract was performable "on or before June 1, 1947," but, on the contrary, found that the agreement was that appellees, *"when said trees achieved the size of 5/8ths to 3/4ths inches,* would pay $1.50 per tree to and accept delivery of said trees balled by plaintiff Ray D. Goodwin." Under this finding of the jury and Goodwin's undisputed testimony, it appears that he could perform his portion of the contract within one year and had the legal right to demand that appellees perform their part of the contract within one year. The contents of Goodwin's letter of December 10, 1945, relating to a different contract than the one sued upon cannot be construed as a "judicial admission," as suggested by appellees or anything similar thereto. United States Fidelity and Guaranty Co. v. Carr, Tex.Civ.App., 242 S.W.2d 224, wr. ref. (decided by this Court on the 11th day of July, 1951). Appellees' "on or before" cases such as, Colvin v. Blanchard, 101 Tex. 231, 106 S. W. 323, and Novosad v. Svrcek, 129 Tex. 34, 102 S.W.2d 393, are not in point here.

■ We hold that the contract as found by the jury was not within the statute of frauds. It is pointed out in Corbin on Contracts, that the provision of the statute of frauds relating to agreements which are "not to be performed within the space of one year from the making thereof" has been narrowly interpreted. "They (the courts) have observed the exact words of this provision and have interpreted them literally and very narrowly. The words are 'agreement that is not to be performed.' They are not 'agreement that is not in fact performed' or 'agreement that may not be performed' or 'agreement that is not at all likely to be performed.' To fall within the words of the provision, therefore, the agreement must be one of which it can truly be said at the very moment that it is made, 'This agreement is not to be performed within one year'; in general, the cases indicate that there must not be the slightest possibility that it can be fully performed within one year." 2 Corbin on Contracts 535, § 444. See also, Thomas v. Hammond, 47 Tex. 42; Wellington Oil Co. v. Maffi, 136 Tex. 201, 150 S.W.2d 60; Long Mfg. Co. v. Gray, 13 Tex.Civ.App. 172, 35 S.W. 32; Overland Automobile Co. v. Cleveland, Tex.Civ.App., 250 S.W. 453; Roman v. Goldberg, Tex.Civ.App., 3 S.W. 2d 482; Kennedy v. McMullen, Tex.Civ. App., 39 S.W.2d 168; 20 Tex.Jur. 256, Statute of Frauds, § 42.

In support of their contention that appellants' action is barred by the two-year statute of limitations, appellees submit the following proposition: "Since the only issue requested by the appellants and found by the jury as to any agreement was to the effect that when the trees had achieved the size of .5/8ths to 3/4ths inch in diameter, the trees were to be accepted and paid for, and since appellants in their brief * * * state, 'plaintiffs testified the whole amount could have been delivered within a year. There was no evidence to the contrary,' the alleged contract as to that part in writing dated March 18, 1946, and plaintiffs testified (sic) that all of the trees were ready for delivery in the fall of 1946 and suit was not filed until May 23, 1949, same was clearly barred by the two year statute of limitation."

■ While the evidence shows that the contract *could have* been performed within one year, it is undisputed that appellees continued to take trees thereunder until December of 1947. It is said in Williston, that, "Aside from any question of disabilities or of fraud or estoppel, there are at least six exceptions to the general rule that the Statute (of limitations) begins to run upon the contract as soon as the cause of action arises upon it." Among the stated exceptions is the situation "where the plaintiff though entitled to maintain an action for an entire breach of contract, may elect to have performance of the contract continue, and does so elect." 6 Williston on Contracts 5678, § 2022.

The Texas cases are in accord. In cases of breach of contract following delayed performance the rule is that the statute of limitations does not begin to run until it appears that the party in default has repudiated the contract and will not continue performance thereunder. Henrietta Nat. Bank v. Barrett, Tex.Civ.App., 25 S. W. 456; Stribling v. Moore, 33 Tex.Civ. App. 297, 76 S.W. 593; St. Louis Southwestern R. Co. of Texas v. Davy Burnt Clay Ballast Co., Tex.Civ.App., 288 S.W. 855; City and County of Dallas Levee Imp. Dist. v. Halsey, Tex.Civ.App., 202 S.W.2d 957.

We next consider the matter of damages. The contract called for 40,000 trees at $1.50 per tree. 28,225 trees were actually delivered, accepted and paid for, leaving a balance of 11,775 trees which were not taken by appellees. The last trees received by appellees were taken in December of 1947, and the next year, on March 4th, Ray D. Goodwin notified the Shary Estate in writing that the trees were ready for spring planting and that if they were not used many of them would be too large for practical planting purposes. However, no further trees were accepted by appellees, and on November 11, 1948, Goodwin, by letter, inquired of Mr. Straw as representative of the Shary Estate, as to the disposition they intended to make of the nursery stock covered by the contract. The record is silent as to the reason why the contract was not carried out. Goodwin testified that upon receiving no reply to his inquiry he made numerous and diligent efforts to sell the trees, but that there was no market for trees at that time. He said, "There was no market price, there was no sale for trees. I take it where there is no sale there is no market." With reference to the intrinsic value of a tree like those here involved to a nursery man, Goodwin said that "it had no value except looks that I know of."

The 11,775 undelivered trees were then growing upon a lot containing a total of 17,186 trees. All of these small trees were banked above the bud for the winter, that is, dirt was piled up around the trunk to protect the tree. In January of 1949, a severe freeze took place and that portion of the tree above the bank was destroyed. The banks were then taken down and the trees rehabilitated by growing new tops thereon. After this was done, the sum of $12,715 was realized from a sale of all the trees upon the lot.

Appellants' theory of the measure of damages was set forth in a motion for judgment upon the verdict which was overruled by the court when judgment was rendered non obstante veredicto. It was as follows:

The contract price for 11,775 trees amounted to $17,662.50. It would have cost ten cents per tree or $1,177.50 to ball the trees and prepare them for delivery, which would reduce the figure of $17,662.-50 to $16,485.00. Eugene M. Goodwin (the son of Ray D. Goodwin) testified that the total expense of rehabilitating and disposing of the 17,186 trees was $1,562.30. Of this he allocated the sum of $1,041.52, or two-thirds thereof, to the 11,775 trees. (The use of the 2/3 fraction rather than .69 in this computation is favorable to appellees.) The jury found that such expense was reasonable and necessary.

The amount realized for the trees after they had been rehabilitated was $12,715.00, of which $8,773.35 was allocated to the 11,775 trees upon a proportionate basis (11,775 to 17,186 or 69%). This item is also supported by a jury finding. The amount of the judgment upon the verdict therefore would be $8,753.17, that is, $16,485.00, less $7,731.83 ($8,773.35 received, less $1,041.52 costs of rehabilitation and sale).

In our opinion, appellants' theory of the proper measure of damages set forth in their motion is correct, and is applicable to the facts of this case. "The fundamental rule in assessing damages is compensation. In case of a breach of contract the value of performance to the plaintiff is the fundamental issue." J. C. Engelman, Inc. v. Sanders Nursery Company, Tex.Civ.App., 140 S.W.2d 500, 508, wr. ref. Contracts are entered into and enforced in order that parties thereto may govern their actions and make plans accordingly. A breach of contract may cause various con-

sequences, depending to some extent upon surrounding circumstances at the time the breach occurs. In this case, so far as the record shows, there was no stated repudiation on behalf of appellees. Appellants had to reach the conclusion upon which they acted from appellees' silence and non-action. It is of course the duty of a plaintiff to minimize damages, but this does not mean that he must choose the methods for so doing at the peril of losing his claim for breach of contract. There are no findings here that appellants did not act prudently in minimizing the damages. In fact, the jury's findings support appellants' contentions.

There was evidence that when Ray D. Goodwin finally decided that appellees did not intend to carry out the contract, there was no market value for small trees for planting purposes. This evidence was uncontradicted. If difference in contract price and market value be taken as the measure, it is apparent that the amount of damages would run much higher than that determined under appellants' formula.

It also seems somewhat unrealistic under the facts of this case to contend that appellants can not recover because they "neither dug, nor balled the trees in question, nor tendered delivery at the end of the nursery row." The evidence shows that appellants were at all times ready and able to perform their part of the contract, and if they had gone further and segregated the 11,775 trees from the other trees growing upon the lot by digging and balling them, when there was no market therefor, it would have simply enhanced appellants' claim for damages.

In our opinion, the following authorities support appellants' theory of the proper measure of damages: White v. Matador Land & Cattle Co., 75 Tex. 465, 12 S.W. 866; Texas Seed and Floral Co. v. Chicago Set and Seed Co., Tex.Civ.App., 187 S.W. 747; J. C. Engelman v. Sanders Nursery Co., Tex.Civ.App., 140 S.W.2d 500; 37 Tex. Jur. 601, 641; Sales, §§ 272, 295.

 Upon the issue of Roy K. Straw's authority to make the contract, there is little or no conflict in the evidence. The jury found that the appellee Southtex Land Sales, Inc., had empowered Straw to make the contract, and T. M. Melden testified with reference to Straw's relationship and course of business practice with this corporation. The jury answered in the negative the question as to whether or not the executrix had empowered Straw to make the contract sued upon, but found that a person of ordinary prudence would reasonably believe from the conduct of the independent executrix that Roy K. Straw was empowered to buy the citrus trees for her. Appellees, by cross-point, contend that an inquiry as to the executrix's conduct relied upon by appellants should have been submitted to the jury. We do not agree with this contention as there is no dispute in the evidence relative thereto.

Both T. M. Melden and Roy K. Straw, who had been employed by John H. Shary and served in executive capacities under him for over twenty years, testified in detail as to the operations of the John H. Shary interests and properties. It appears from the record, primarily from the testimony of T. M. Melden, that Mr. Shary was one of the pioneer developers of the citrus fruit industry in the delta area of the Rio Grande. He lived to see the fruition of many of his plans and undertakings. Prior to and at the time of his death he was the owner of properties located in thirty states and was the dominant force in numerous corporations, including the Sharyland Orchards and Nurseries, Inc., Southwestern Land Company, Texas Citrus Growers Exchange, Shary Products Company, United Irrigation Company and Southtex Land Sales, Inc. These various companies were managed together and Melden and Straw served as the executives under the general direction of Mr. Shary.

After Mr. Shary's death in 1945, his various associated properties and companies were operated by Melden and Straw for and on behalf of the estate in much the same manner as they had been during Mr. Shary's lifetime. Contracts were made and letters written by both Melden and Straw for and on behalf of the John H. Shary interests or the John H. Shary Estate. For

example, it appears that Roy K. Straw, in corresponding with appellants with refrence to the contract here involved, signed letters for and on behalf of "John H. Shary Estate" and "Southtex Land Sales, Inc." Mr. Melden testified that the Shary Estate included, "The John H. Shary (Sharyland) Orchards and Nurseries, Southtex Land Sales, Incorporated," as well as other corporations.

Roy K. Straw testified that after discussing the matter with Mr. Melden as general manager of the John H. Shary Estate, it was decided that he should make a contract for the delivery of 40,000 trees with Ray D. Goodwin. The letter of March 18, 1946, above set out, was signed by Straw on behalf of "John H. Shary Estate," and, although set out as an exhibit to the petition, appellees made no verified denial of the authority of Straw to execute the instrument. Rule 93(h), R. C. P. Under the undisputed facts as above set forth and the jury's findings, it must be held that the contract was binding upon the executrix of the John H. Shary Estate. The independent executrix was authorized to continue the various Shary business enterprises and persons who had had dealings with the Shary organization were not placed on notice that there was any change in the authority theretofore exercised by Straw and Melden. Article 3427, Vernon's Ann.Civ.Stats.; Dallas Tailors' Supply Co. v. Goen, Tex.Civ.App., 25 S.W.2d 224; Simpkins Administration of Estates in Texas (Holt Revision) p 182.

What has been said disposes of this appeal. Appellants' three points of error are sustained. Appellees' seven cross-points of error are overruled. The trial court should have sustained appellants' motion for judgment upon the findings of the jury.

The judgment of the trial court is reversed and, in accordance with the provisions of Rule 434, R. C. P., judgment is here rendered that appellants, Ray D. Goodwin and Eugene M. Goodwin, do have and recover of and from appellees, Southtex Land Sales, Inc., and Mary O'Brien Shary in her capacity as independent executrix of the estate of John H. Shary, deceased, jointly and severally, the sum of $8,753.17, together with interest thereon from February 23, 1951 (the date of the judgment in the trial court) until paid, at the rate of six per cent per annum.

Reversed and rendered.