Mary Oliver LYLES, Appellant,

v.

TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Appellee.

No. 7456.

Court of Civil Appeals of Texas.
Texarkana.

Feb. 26, 1963.

Rehearing Denied March 26, 1963.

**820**

———◆———

Jim S. Phelps, Davis, Phelps, Liles, Norton & Gray, Morgan H. Johnson, Anthony J. Maniscalco, Houston, for appellant.

Jerry V. Walker, Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, for appellee.

DAVIS, Justice.

A Workmen's Compensation case. Monroe Oliver Lyles was injured on July 13, 1959. He was working for H. L. Allen Oil Company in Houston, Harris County, Texas. He died on June 8, 1960, of an acute myocardial infarction. Plaintiff-appellant, Mary Oliver Lyles, a widow, prosecuted the case against defendant-appellee, Texas Employers' Insurance Association. The claim was based upon disability benefits at the rate of $35.00 per week from July 13, 1959, to June 8, 1960, and for death benefits on the theory that the death resulted from the injury, and for medical and hospital bills as the result of said injury. The appellee stipulated that Monroe Oliver Lyles received an injury on July 13, 1959. That he was permanently and partially disabled until the date of his death, and admitted liability until that time, together with the claim for medical and hospital bills. The case was tried to a jury. Only one special issue was submitted, which inquired whether or not the accidental injury sustained by Monroe Oliver Lyles on July 13, 1959, was a producing cause of his death. The jury could not agree upon an answer. They began deliberations on November 16, 1961, and advised the court that they were unable to reach a verdict on November 17, 1961.

Based upon such instructions the appellee made a motion to discharge the jury, and to declare a mistrial.

There seems to have been some misunderstanding as to whether or not a mistrial was declared. Counsel for appellant understood the case was reset for trial on December 15, 1961. Nevertheless, the trial court made notations on his docket that the case was withdrawn from the jury. On December 14, 1961, attorney for the appellee wrote a letter to the attorney for the appellant, advising him that there would be a motion presented for judgment, and that the trial court had set the same for hearing for December 18, 1961. Attorney for appellant did not receive the notice. On December 18, 1961, the attorney for the appellee actually filed a motion for judgment. He did not furnish the attorney for the appellant with a copy of same, nor was any notice actually given to him of the hearing on the motion. Nevertheless, the trial court granted the motion for summary judgment, and rendered judgment that the appellant recover total permanent disability from July 13, 1959, to June 8, 1960, plus medical and hospital benefits, but denied death benefits. The attorney did not receive the letter notifying him that a hearing on the motion for judgment was to be had until Dec. 26, 1961; neither did he receive a copy of the motion for judgment. On Dec. 28, 1961, attorney for the appellant filed a motion to strike the judgment, and a motion for a mistrial. The motions were summarily heard and overruled on January 2, 1962. On January 30, 1962, the trial court signed and entered a written judgment. The appellant filed a motion, and an amended motion for retrial, which was heard and overruled. She has perfected her appeal and brings forward nine points of error.

By her point One she takes the position that the trial court erred in withdrawing the case from the jury, and entering a judgment which denied plaintiff death benefits, because there was sufficient evidence to warrant a submission to the jury on the question of whether or not the accidental

injury was a producing cause of the death of Monroe O. Lyles.

▮ According to the evidence, Monroe O. Lyles was injured while he was in the process of moving with a buggy a barrel of oil that weighed about 450 lbs in the warehouse of the oil company. There was no witness to the accident, but the same was stipulated by the appellee. Apparently the barrel of oil slipped and fell on the said Monroe O. Lyles, or injured him some way or another. The appellee makes the statement in its brief that, "The injury occurred when a barrel which Lyles was lifting fell upon him". It resulted in an injury to his back, elbow, leg, and finger. Immediately after the injury the employer was notified, and they carried Lyles to the St. Luke Hospital. The family physician of Monroe O. Lyles was called to treat him. Because of the nature of the injuries and the highly nervous condition of Lyles, he was placed in a private room in a hospital, for which the hospital apparently charged $25.00 per day. On the day after the accident the employer and an agent of the appellee went to the hospital to see Lyles. Apparently there was some disagreement between them as to the charges being made, and to the doctor that was treating him. As a result of all this, Lyles was fired from his job and the appellee refused to pay the hospital and medical expenses.

There were numerous telephone calls, and on the 3rd day after the injury, after a telephone call to Lyles, he immediately left the hospital without any orders from the Doctor or hospital authorities, and went home. He was confined to his bed, at home, for about two months. The family physician actually saw him a total of 41 times after the injury and prior to his death. He did not see him on the occasion of the acute myocardial infarction. A lot of the foregoing evidence was not allowed to go to the jury. Such refusal was error on the part of the trial court. All the evidence pertaining to the condition of Monroe O. Lyles as to the injury, as to the hospital treatment, about

Lyles being fired, the argument about paying the hospital and medical expenses, and whether or not he had any money to pay hospital bills was admissible to show that the condition actually produced a cause of his death.

▮ Dr. Leon Phillips was the family physician. He testified positively on the witness stand that the injury actually caused the acute myocardial infarction. Based upon the evidence which he explained, it created a fact issue upon which the jury should have decided. As to whether or not the accident was a producing cause of the death, Dr. Phillips testified as follows:

"Q. I'm saying to you, sir, that the injury that was described to you as occurring in the warehouse of the H. L. Allen Oil Company, whether it happened or not, but assume it did, and the injury as described to you in which he injured his hand and his elbow and his back, and the complaints the man made to you as evidenced in your records and the hospital records: I'm asking you, doctor, based upon these facts—

"A. In this particular case it produced—

"Q. In this particular case, and as the question was as I phrased it, sir, the accident as described that occurred on July 13, 1959, would you have an opinion based on reasonable medical probabilty as to whether that incident as described was the producing cause of the acute myocardial infarction causing the death of Monroe Oliver Lyles on June 8th, 1960?

"A. Are you talking about the entire course?

"Q. Sir, the question is very clear. I asked you, sir, based upon the instance occurring in the warehouse some eleven months previously.

"A. Yes, it did.

"Q. What is an acute myocardial infarction, Dr. Phillips?

"A. An acute myocardial infarction is that condition which is produced by a thrombosis of a coronary vessel in which the muscle dies.

"Q. And if the coronary thrombosis is caused by death of a muscle—

"A. That is an acute condition.

\* \* \* \* \* \*

"Q. And are you saying that an injury to the man's back and to his hand caused that muscle in his heart to die?

"A. I didn't say specifically the injury.

"Q. All right, sir. Are you then changing your answer?

"A. No, I'm not. I said the composite picture produced the coronary.

\* \* \* \* \* \*

"A. Yes, it produced it.

\* \* \* \* \* \*

"Q. That incident—

"A. The incident incited the sequence of events that produced it.

"Q. The sequence of events?

"A. Without the accident the man wouldn't have \* \* \*"

Dr. Phillips testified of the bill of exception as follows:

"Q. Go right ahead.

"A. Well this man was made to leave the hospital by his employer and by the insurance company who went into his room at St. Luke's. They perpetuated a situation that was intolerable to the patient. Now, he got up and left, not discharged, but he left. They continued to harrass him to such an extent at his home that it was almost terrible—I had as many as six calls a day from the harassment. The man was intently ill at home and because of this situation, you see, he would not—I asked him to go to the hospital, St. Jo's, and at which place I would take care of his bill. He refused to go because he said, 'Doctor, I don't have any money \* \* \*'

(Objections)

"Q. Go right ahead.

"A. Now, as this went on, the man's back was getting worse progressively. I saw him in the office. It was difficult because of the tenderness and everything else that went along with this thing to even examine the man well. And I think this would be verified by the orthopedist who saw him later. I treated him, you see, and in spite of everything—. Now, this man was fired from his job, I wanted him to try to go back to work. He wanted to see what he could do, and he couldn't do anything with the stress of the injury and the mental aggravation. This man continued into a phase of a difficulty, which by at the end of say six months, something like that, and I don't remember just exactly, but he developed this myocardial failure.

"Now the myocardial failure is a stress syndrome. A man doesn't have to be lifting anything. It is the same syndrome that you get with ulcers, with a stress, and it can—it can come overnight. A man wakes up with an ulcer under an extreme stress. He can lose all of his money one day and the very next day he will have an ulcer.

"Now, this is the thing that precipitated—one thing going into another.

"Now, the insurance company stressed to this man that if he went to me, you see, that he wouldn't get a dime. And I didn't care whether he ever paid me. It wasn't the thing of payment with me, but this man's condition was such that he had to have some help from some source to live off of. This materially worried the man, and this was all in a precipitating factor that produced the whole grandiose picture of cardiac failure.

"Now, the cardiac failure predisposes to a coronary because there is not an adequate circulation to the heart, and you may bring up the picture as to why. I didn't do EKG's on this fellow, and x-rays, because he didn't want them done because he was not able to pay for them. And there were many years that went by that I have treated this family, and you go through the record and you feel that—I just saw him for this and that, you see. This man needed help. He needed not only treatment, but he needed a little moral support. And you don't have to have an EKG to make a diagnosis—

\*      \*      \*      \*      \*      \*

"A. —of a cardiac situation.

\*      \*      \*      \*      \*      \*

"Q. As I understand it, doctor, for the purpose of this bill of exceptions and for this purpose only, the Court has said to let you explain what you meant by 'psychosomatic experiences'. If you have anything else to say to explain that, please continue.

"A. The injury and the stress syndrome is psychosomatic.

"Q. Are you through, sir?

"A. That is your answer.

"Q. Are you through?

"A. I'm through.

"Q. All right."

Dr. Phillips testified before the jury as follows:

"Q. All right. We will take out producing. Was an immediate cause, whether that was an immediate cause of the acute myocardial infarction which I asked you to assume was the cause of the man's death on June 8th of 19—

"A. It was not the immediate cause.

"Q. All right, sir. And the incident as described that occurred at the warehouse was not a cause of the acute myocardial infarction which was the cause of the man's death?

"A. It was.

"Q. The incident and the barrel—the barrel incident as described in this question and in your records, doctor, in that alone?

"A. It precipitated it.

\*      \*      \*      \*      \*      \*

"Q. Thank you.

"Now I'm going to ask you, doctor—I'm going to ask you a hypothetical question. \* \* \* (The question was based upon the facts in the case).

"MR. WALKER: Your honor, I have numerous objections to that question: \* \* \*.

"THE COURT: I overrule the objection.

"Q. Now, can you answer that, doctor? Omit the chest pains, sir, and can you then answer that?

"A. It was the producing factor that terminated in this man's death."

The foregoing testimony is of such probative force it presents a fact issue for the jury. There was other testimony for the appellant by lay witnesses corroborating the testimony of Dr. Phillips. Another doctor testified for the appellee that the injury was *not* a producing cause of the death. Such testimony only created a fact issue for the jury to decide.

 It is the duty of this court to review the record with all the evidence in the case that is relevant to the issues involved, and consider it in the light most favorable to the appellant, disregarding all conflicts and indulging in every intendment reasonably deducible from the evidence in favor of the appellant. City of Houston et al. v. Chapman, 132 Tex. 443, 123 S.W.2d 652; Anglin v. Cisco Mortgage Loan Co., 135 Tex. 188, 141 S.W.2d 935; Wellington Oil Co. of Delaware v. Maffi, 136 Tex. 201, 150 S.W.2d 60.

The evidence presents an issue of fact which the jury must decide. In American Motorists Insurance Company v. Landes, 5 Cir., 252 F.2d 751, the Court had this to say: " * * * The testimony was conflicting as to whether Landes' strain aggravated the pre-existing tumor and was a producing cause of death. Resolving the conflicts and sifting the facts and opinions was a jury function and the submission to the jury was proper. * * *" That is a case where a man received an injury on July 15, 1955, and died on July 1, 1956. See, also, Maryland Casualty Co. v. Rogers, Tex.Civ.App., 86 S.W.2d 867, er. ref.; Texas Employers' Ins. Ass'n v. Wade (Tex. Civ.App.), 197 S.W.2d 203, W/R, N.R.E.; Pacific Indemnity Co. v. Arline (Tex.Civ. App.) 213 S.W.2d 691, err. dism'd; Traders & General Ins. Co. v. Anderson (Tex.Civ. App.) 246 S.W.2d 290, err. ref.; Liberty Mut. Ins. Co. v. Murphy (Tex.Civ.App.) 205 S.W.2d 398, N.W.H. For cases holding that an injury can produce a cause of death see Texas Employers' Insurance Association v. Williams, Tex.Civ.App., 297 S.W.2d 717, W/R, N.R.E.; American General Insurance Company v. Barrett et al. (Tex.Civ.App.), 300 S.W.2d 358, W/R, N.R.E. The point is sustained.

Since there is a fact issue, and the case must be reversed and remanded, the other points of error will not be discussed. They will be sustained, however, with the hope that in a future trial such errors will not occur.

The judgment of the trial court is reversed and the cause is remanded.