**Trudy CARTER, Appellant,**

v.

**Gloria CONVERSE, Appellee.**

**No. 992.**

Court of Civil Appeals of Texas, Tyler.

March 31, 1977.

Rehearing Denied April 28, 1977.

Mike A. Hatchell, Ramey, Flock, Hutchins, Grainger & Jeffus, Tyler, for appellant.

James N. Parsons, III, Paxton, Whitaker & Parsons, Palestine, for appellee.

DUNAGAN, Chief Justice.

This is a suit to set aside certain deeds and a deed of trust and for full right, title and possession to a lot and residence in the city of Palestine, Texas, which lot and residence was the homestead of appellee, plaintiff below, and her ex-husband. Appellee brought suit against her ex-husband J. W. Converse, Clarence Ellis and his wife, Cynthia Ellis, Joyce Gilmore, First Savings and Loan Association of Athens, Texas, and Trudy Carter, alleging that the above parties participated in several acts of fraud that culminated in the unlawful alienation of her homestead from her title and possession. Appellee sought damages in addition to her requests that the legal instruments in question be held void and set aside. The case was submitted to the jury which answered special issues generally in favor of appellee, and the court entered its judg-

ment ordering that appellee recover her homestead and that title and possession of same be restored to her, and that appellee have her writ of possession to secure said premises. Appellant Trudy Carter moved for judgment n. o. v. which was overruled, and thereafter made her motion and amended motion for new trial. None of the other defendants appeal. We affirm.

In answer to special issues, the jury found that:

(1) on July 26, 1972, when appellee signed a Power of Attorney to her husband, J. W. Converse, she was acting while under duress, while under the undue influence of her husband, and while she was mentally incapacitated (Special Issue No. 1);

(2) the deed from J. W. Converse, individually and as attorney-in-fact for appellee, to Melton Ellis and wife was intended by them to be a mortgage (Special Issue No. 2);

(3) appellant's title attorney finally approved the title to the property in question on October 9, 1972 (Special Issue No. 3);

(4) appellant and/or her attorney, on or before October 9, 1972, "either knew, or knew fact or facts sufficient to show by circumstances or in the reasonable exercise of reasonable diligence should have known fact or facts showing that the deed" from J. W. Converse to Melton Ellis and wife was a mortgage (Special Issue No. 4); and that

(5) appellant Trudy Carter bought the house in good faith, believing she was getting good title to the same (Special Issue No. 5).

Appellant alleges three points of error. In points one and two appellant urges that the court erred in overruling her motion for judgment n. o. v., "because there is no evidence to support the answer to Special Issue No. 4, whereby the jury found actual or imputed knowledge by defendant (appellant herein), or her attorney, that the Converse-Ellis deed was intended as a mortgage," and alternatively (point of error No. 2) that the jury's answer to Special Issue No. 4 is either unsupported by factually sufficient evidence or is against the great weight and overwhelming preponderance of the evidence. In her third point of error appellant complains of the court's admitting into evidence a certain letter and check for the reason that the two items were remote, legally irrelevant, and "reversibly prejudicial to defendant's position in regard to Special Issue No. 4."

The facts preceding and giving rise to this controversy were as follows. J. W. Converse and his wife, Gloria Converse (hereafter sometimes called appellee) purchased the home in question by warranty deed in 1961 and continued to occupy the same as their homestead up to the time the events giving rise to this controversy commenced. Appellee and her husband were divorced on October 10, 1975.

During the latter years of the Converse's marriage their relationship deteriorated, due in principal part to serious medical problems suffered by appellee consisting mainly of digestive tract complications. She underwent numerous operations and extensive treatments and her overall health declined severely. This in turn lead to a deteriorating mental-emotional state and addiction to drugs and narcotics. In 1971 she was placed in a private nursing home for a period of one month. In May, 1972 she was involuntarily committed to the Rusk State Hospital until July 10, 1972. On July 24, 1972, she was admitted into a Palestine hospital for two days suffering from a drug overdose.

Because of these chronic health problems and their effect upon the family relationship, it was decided that appellee should spend some time with her brother in Philadelphia, Pennsylvania. On July 26, 1972, appellee was released from the Palestine hospital and left for Philadelphia the next day.

For some time appellee's husband (hereafter called Mr. Converse) had been trying to sell the family homestead. His intentions were, allegedly in part, to sell the homestead (a very large house) and buy a less expensive home, using the surplus money to pay community debts caused by appellee's illnesses. On several occasions, J. W.

Converse had attempted to persuade appellee to give him a power of attorney, which she had refused to grant.

On the night of July 26, Mr. Converse again presented appellee with a power of attorney authorizing him to sell, encumber, or lease the homestead for the purpose of raising funds to pay community debts. Since appellee was to leave for Philadelphia the next day, appellee signed the power of attorney and acknowledged her signature before Melt Ellis, a defendant in the trial court and Mr. Converse's employee and business associate.

The jury found that this power was executed under duress, undue influence, and while appellant was mentally incapacitated (Special Issue No. 1). Appellant does not challenge this finding.

Approximately three months later, Mr. Converse, acting for himself individually and under his wife's power of attorney, conveyed the homestead to Mr. Ellis and his wife by an instrument entitled a warranty deed dated October 27, 1972, which said instrument was later filed for record on November 16, 1972. The purchase price was stated to be $25,000.00 and was financed in that amount through the Henderson County Savings and Loan Association of Athens by a loan and deed of trust arrangement. Mr. Converse himself paid the loan application fee to the savings and loan and also co-signed the note given to obtain the loan.

The Converse family continued to occupy the premises after the deed to Mr. Ellis and wife. There is evidence to the effect that Mr. Converse rented the premises from Mr. Ellis through a rental agreement for a monthly rental equal to the monthly payment owed on the Ellis-Converse note to the savings and loan; that Mr. Ellis never exercised dominion or control over the home; that Mr. Converse made all the payments on the Ellis-Converse note; that the savings and loan company contacted Mr. Converse when the note payments were late; that Ellis never depreciated the home as rent property; and that Ellis and Mr. Converse had an agreement that in the event Mr. Converse died, Ellis would deed the premises back to the Converse family. Converse and Ellis both testified that this sale was a legitimate conveyance not intended to be a mortgage, and that Converse's occupancy was as Ellis's tenant under a formal rental contract. There is also testimony, however, that the sale was actually a sham conveyance concocted so that Mr. Converse could obtain money through refinancing the homestead. The jury, in its answer to Special Issue No. 3 found that the Converse to Ellis conveyance was intended to be a mortgage. Appellant does not challenge this finding, admitting that some circumstantial evidence exists supporting the jury's finding.

Appellee returned from Philadelphia to Palestine, Texas in November of 1972 after the Converse to Ellis conveyance and remained there for approximately a year and a half. The Converse family during this time continued to occupy the residence. Appellee testified that one evening during this period Mr. Converse told her that he had refinanced the house through Mr. Ellis and that that was the first time she had heard anything about it; that she didn't inquire further about it because she didn't know what she could do about it; and that he told her that if anything happened to him there was a deed for her to file.

After an altercation with Mr. Converse, appellee returned to Philadelphia on the advice of her doctor in January, February or March of 1974. The record is not clear as to the exact date.

Converse, after he mortgaged the property to Ellis through the savings and loan, listed the home for sale with real estate agents in Palestine. Later, in August of 1974, and while appellee was in Philadelphia, appellant became interested in the home as a potential home for the foreman of a nearby ranch owned by appellant's husband.

In September of 1974, after negotiation with Mr. Converse, who specifically represented to Mrs. Carter that Ellis was the owner of the property and that he (Converse) was acting as Ellis's agent, a con-

tract of sale was entered into for a total sum of $41,500, with appellant agreeing to assume the existing indebtedness against the home. Converse agreed to do certain repairs to the home, which he did. About this time, i. e. on September 13, 1974, Mr. Converse also filed for divorce.

Upon reaching this sale agreement, appellant employed an attorney, John Davis, to formalize the transaction, examine the title and handle the closing and disburse the funds. Since a contract of sale had already been entered into between Mr. Converse and appellant and a deed actually prepared when appellant's attorney was employed, he suggested that the net proceeds due the seller be escrowed pending his examination. Appellant then escrowed $16,937.00, which sum was deposited by her attorney in his trust account. The deed from Ellis and wife (the sellers of record) to appellant was delivered to appellant's attorney's office later that day or the next day by Mr. Converse.

At no time did appellant ever talk to or otherwise contact Ellis or his wife, and appellant's attorney stated at different times that he did not contact Ellis or that he could not recall contacting Ellis. Ellis himself stated that he never was contacted by appellant or her attorney. Appellant and her attorney dealt entirely with and through Mr. Converse.

Ellis signed the deed to appellant at Mr. Converse's office and at that time he did not know either the amount of the sales price of the home or whether or not there was a gain or loss on the home. He did not acquire that knowledge until depositions were taken in this lawsuit.

Appellant, who testified that she was in the property investment business, relied upon her attorney and abstract company fully in all matters. At the time of her purchase, appellant knew that:

(1) the Converse's had owned the home prior to the Ellises;

(2) Mr. Converse and appellee Mrs. Converse were getting a divorce;

(3) Joyce Gilmore was having an affair with Mr. Converse;

(4) appellee Mrs. Converse was in Pennsylvania;

(5) Mr. Converse was and always had been in possession of the home;

(6) the alleged rent being paid by Mr. Converse was the amount of the monthly note payment to the savings and loan company; and

(7) Mr. Converse negotiated the transaction entirely and agreed to make certain repairs to the home without checking with Ellis.

As mentioned earlier, Mr. Converse presented the Ellis to Carter deed, dated and completed, to appellant's attorney. Her attorney testified that his law practice consisted primarily of real estate work and that this particular transaction was the first time he "had a real estate transaction closed in such a way where the person was ready to buy and the deed was there ready to go." Nevertheless, after examining title, appellant's attorney drew and required a ratification deed from appellee ratifying the Converse to Ellis transaction. This was allegedly required because the power of attorney was not recorded until September 19, 1974 (the Converse to Ellis deed was recorded on October 27, 1972); and the power of attorney, in its signature line, misstated appellee's name as "Cynthia" Converse instead of Gloria Converse, and that "in an over-abundance of caution . . . [appellant's attorney] . . . required a ratification deed."

It is not clear on what day appellant's attorney prepared the ratification deed. It was given to Converse who was to have his wife, appellee, execute it. Appellee at this time was in Pennsylvania. The signature of appellee Gloria Converse appearing on the ratification deed is without dispute a forgery.

The ratification deed was forged by appellee's and Mr. Converse's daughter, who testified that she signed her mother's name at her father's request. The ratification deed was notarized on October 4, 1974, in

Anderson County, Texas, by Joyce Gilmore, who had been carrying on an affair with Mr. Converse and is the present wife of Mr. Converse. As mentioned earlier, appellant knew that Mr. Converse was having an affair with Gilmore, and had, in fact, been in their presence while they were together.

The forged ratification deed was returned to appellant's attorney's office by Mr. Converse on October 7, 1974 or the day before. Appellant's attorney testified as follows:

"Q. All right, but the point is, John, that your client, Trudy Carter, by deposition yesterday testified that she knew Bill and Gloria Converse were getting a divorce and similarly she knew that Gloria Converse was in Pennsylvania. Did she tell you either of those two items?

"A. No.

"Q. She did not?

"A. She did not.

"Q. And if she had told you, wouldn't it have struck you funny that if Gloria Converse is in Pennsylvania, that the Ratification Deed was acknowledged in Anderson County?

"A. You want me to explain the Ratification Deed?

"Q. Explain it.

"A. Like when I made the requirement or when I decided to do this on the title work and I called Mr. Converse and told him that I was requiring, this Ratification Deed, I asked him where his wife was. He told me his wife was in Pennsylvania. I said, 'Fine are you going to get this up there or how are you going to get it done.' Answer, he said, 'She is supposed to be here or Houston or'—I can't remember—'one day and I'll get her to sign it on that day.' After that he brought the thing in.

. . . . .

"A. Well, when the Ratification Deed was delivered to me then my work was completed.

"Q. Do you recall when this was, what point in time?

"A. The letter to Mr. Ellis dated the 7th. It was either that day or the day before. It was before the letter was written.

"Q. Really, your decision [to approve title] didn't depend on the letter so much as it did the Ratification?

"A. No. The letter was an afterthought after that was done.

"Q. That [the letter] was in regards to the disbursements, is that correct?

"A. That's correct."

When Mr. Converse returned the forged ratification deed to appellant's attorney, Mr. Converse then requested that the net proceeds from the sale, $16,632.77, be paid to him (Converse) and not Ellis. The record shows that appellant's attorney did not ask Converse why he was to receive the $16,632.77 even though the record shows there was no support for the payment; that appellant's attorney did not contact Ellis at any time and ask him why Converse was receiving the funds; that appellant's attorney required a letter which he drew for Ellis and his wife's signatures, holding him harmless for paying the funds to Converse. Converse took the letter, had it signed by Ellis and his wife, and returned it to the attorney on October 9, 1974. On October 9, appellant's attorney authorized a check to be made payable to Converse for $16,632.77 bearing the notation "Conveyance to Trudy Carter," and on October 9, 1974, he had a check issued to the County Clerk of Anderson County, Texas, bearing the notation "Converse to Carter." Both checks were signed by the attorney's secretary.

Other items of evidence, which were admitted over appellant's objection are (1) a letter from Davis to appellant dated October 28, 1974, beginning with "In connection with the purchase of the house here from Mr. Converse . . . ."; and (2) a check drawn on Davis's trust account paying Davis for his legal fees dated October 30, 1974, bearing the notation "Converse to Carter."

It is undisputed that appellee did not know of the purchase by appellant. Converse, after the sale and as was his habit, forwarded appellee's medicine to her in

Pennsylvania. He would pack it with newspaper in a box. Mrs. Converse testified that while she was in Pennsylvania she was homesick and "wanted to read about Palestine," Texas. Included within one of the boxes of medicine was a portion of a Palestine newspaper containing the legal records. Appellee read the legal records, recognized the legal description of her home, and obtained her first knowledge of the sale of Ellis to appellant.

 Appellant's "no evidence" and "insufficient evidence" points of error attack the jury's finding that appellant or her attorney "either knew, or knew facts or facts sufficient to show by circumstances or in the reasonable exercise of reasonable diligence should have known" that the Converse to Ellis conveyance was a mortgage. The absence of actual or imputed knowledge is critical to the preservation of the bona fide purchaser shield cutting off the rights or equities of third parties. A bona fide purchaser of realty is one who buys property in good faith for valuable consideration and without knowledge (actual or imputed) of outstanding claims in a third party or parties. *Houston Oil Co. of Texas v. Hayden*, 104 Tex. 175, 135 S.W. 1149, 1152 (1911); *Socony Mobil Oil Corp. v. Belveal*, 430 S.W.2d 529 (Tex.Civ.App., El Paso 1968, ref'd n. r. e.) cert. denied, 396 U.S. 825, 90 S.Ct. 68, 24 L.Ed.2d 76.

 Any actual or imputed knowledge held by appellant's attorney is chargeable to appellant. See *Wellington Oil Co. of Delaware v. Maffi*, 136 Tex. 201, 150 S.W.2d 60, 63 (1941); *Hexter v. Pratt*, 10 S.W.2d 692 (Tex.Com.App.1928); *Bouldin v. Woosley*, 525 S.W.2d 276, 279 (Tex.Civ.App., Waco 1975, n. w. h.); *Portman v. Ernhart*, 343 S.W.2d 294, 299 (Tex.Civ.App., Dallas 1960, ref'd n. r. e.). It is this combined knowledge that is the standard by which we must decide what evidence, if any, supports the jury's findings that appellant or her attorney had knowledge of facts which would have put them on further inquiry. "Since the principal, if he had conducted the transaction for himself, would in all probability have ascertained the facts which came to the knowledge of the agent in making the transaction, he should not be allowed to avail himself of the circumstance that he acted through an agent, and to say that, although his agent was affected with notice, he acted in good faith." *Teagarden v. R. B. Godley Lumber Co.*, 105 Tex. 616, 154 S.W. 973, 975 (1913).

To allow appellant to contend successfully that since her attorney did not know facts which she knew, she could not be bound by his failure to make further inquiry because he did not know those facts, would, in effect, circumvent the above quoted rule of the *Teagarden* case. Such a situation would, in effect, allow appellant to insulate her knowledge from the knowledge of her attorney.

Appellant contends that the deed record existence of the Converse to Ellis deed precluded constructive or imputed knowledge of the mortgage situation even though Mr. Converse remained in possession of the premises after the Converse to Ellis conveyance, relying on the doctrine laid down in *Eylar v. Eylar*, 60 Tex. 315 (1883). Appellant attempts to limit notice to one fact— that being the continued possession of Mr. Converse. Quoting from her brief, appellant states "So, under *Eylar v. Eylar*, no imputed or constructive knowledge of an adverse claim could be visited upon Mrs. Carter merely by Converse's possession *and*, by virtue of the recorded Ellis deed, she was further, as the cases say, '. . . relieved of further inquiry' . . . barring some actual knowledge of a fact inconsistent with the purport of the Ellis deed.' ", citing cases. Appellant further contends that in addition to the fact that she had no actual knowledge, even if she had been under a duty to inquire, she and her attorney pursued the inquiry that would have been pursued by an ordinary prudent person. We disagree.

In the case of *Hexter v. Pratt*, supra, 10 S.W.2d at p. 693, it is stated:

"Notice in law is of two kinds—actual and constructive. These descriptive terms need but little explanation. In common parlance 'actual notice' generally

consists in express information of a fact, but in law the term is more comprehensive. In law, whatever fairly puts a person on inquiry is sufficient notice, where the means of knowledge are at hand, which if pursued by the proper inquiry the full truth might have been ascertained. Means of knowledge with the duty of using them are in equity equivalent to knowledge, itself. Where there is a duty of finding out and knowing, negligent ignorance has the same effect in law as actual knowledge. So that, in legal parlance, actual knowledge embraces those things of which the one sought to be charged has express information, and likewise, those things which a reasonably diligent inquiry and exercise of the means of information at hand would have disclosed. Actual notice is always a question of fact."

*Hexter v. Pratt,* supra, has been cited with approval by the Supreme Court in *Champlin Oil & Refining Co. v. Chastain,* 403 S.W.2d 376, 388 (Tex.Sup.1965); *Woodward v. Ortiz,* 150 Tex. 75, 237 S.W.2d 286, 289 (1951); *Flack v. First Nat'l Bank of Dalhart,* 148 Tex. 495, 226 S.W.2d 628, 632 (1950). In the *Champlin Oil* case the Supreme Court, 403 S.W.2d at page 388, stated that "It has been determined by Texas authority that imputed actual notice carries with it the same legal consequences as conscious knowledge."

We agree with appellant's statement in her brief that the scope of Special Issue No. 4 and this appeal is limited to whether or not appellant or her attorney had notice that the Converse to Ellis conveyance was a mortgage, and that "the judgment stands or falls upon knowledge of that fact." Thus, the fact that there was an outstanding homestead claim due to the invalid power of attorney and forged ratification deed will not support the judgment on appeal if there was no actual knowledge of a mortgage situation.

However, the chief issue here concerns the extent of inquiry made by appellant and her attorney. Any inquiry of appellee made by them would have revealed the following evidence, as testified to by appellee:

"Q. . . . Now, Gloria, when did you find out that he [Mr. Converse, appellee's husband] had deeded the house [to Ellis] and that he obtained a new loan through Athens [savings and loan company]?

"A. One evening he [Mr. Converse] was talking to me in bed and he said— he told me if anything should happen to me he says you'll find the deed in the safe over at the lumberyard.

"Q. What deed was that?

"A. That's what I asked him, what deed? And he says it's to this house. And I said what am I supposed to do with it? He said, 'Just go file it.' 'I had refinanced the house and used Melt Ellis.' And that's the first I heard about it."

Accordingly, we find there is some evidence to support the jury's answer to Special Issue No. 4. When considering a no evidence point, the reviewing court must view the evidence in support of the jury findings in its most favorable light considering only the evidence and reasonable inferences to be drawn therefrom which support the finding and rejecting the evidence and inferences contrary to that finding. *Miller v. Riata Cadillac Co.,* 517 S.W.2d 773 (Tex.1974); *Transport Ins. Co. v. Mabra,* 487 S.W.2d 704 (Tex.1972).

Each conveyance of real property is, in its very nature, a different set of circumstances from any other conveyance. We are not prepared to say that in each real estate transaction, the purchaser or his agent should inquire directly to the seller, or the seller's predecessor in title. There is no uniform standard of diligence in checking title beyond the usual record title search. Beyond the usual record title search, purchasers must use that diligence which fits the situation. In light of the circumstances of this case, we feel that appellant and/or her attorney should have inquired directly of appellee or Ellis. There are enough facts supporting the jury's an-

swer to Special Issue No. 4 to support the inference that had appellant or her attorney inquired of appellee and Ellis, the fact that the Converse to Ellis conveyance was a mortgage would have been discovered. Certainly an inquiry of appellee would have prevented the forged ratification deed and probably would have discovered the facts surrounding the execution of the power of attorney, which was found to have been executed under duress, undue influence and while appellee was mentally incapacitated. This aside, appellant or her attorney or both knew, individually and collectively. that:

(1) the Converses were the predecessors in title to Ellis and had remained in possession of the home;

(2) Ellis notarized the power of attorney, which was not filed for record until approximately two years after the Converse to Ellis conveyance;

(3) Mr. Converse and Joyce Gilmore were having an affair;

(4) the Converses were getting a divorce;

(5) Joyce Gilmore notarized the ratification deed;

(6) appellee was in Philadelphia, Pennsylvania;

(7) the alleged rent paid by Mr. Converse was the amount of the note payment to the savings and loan;

(8) Mr. Converse agreed to make repairs to the home;

(9) a homestead declaration was on file; and

(10) Mr. Converse at his request was to receive the proceeds from the sale to appellant.

In considering a factual sufficiency point, this court must consider and weigh all evidence in the case and set aside the judgment and remand only if we conclude that the judgment is against the great weight and preponderance of the evidence and is manifestly unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661

(1951); *Cox Enterprises, Inc. v. Filip,* 538 S.W.2d 836 (Tex.Civ.App., Austin 1976, n. w. h.). We have reviewed the entire record and are of the opinion that the evidence is of sufficient strength to support the jury's findings and such findings are not against the great weight and preponderance of the evidence. The above listed facts, alone, support our opinion that appellant or her attorney knew "facts sufficient to show by circumstances or in the reasonable exercise of reasonable diligence should have known fact or facts showing that the deed from Converse to Ellis was a mortgage." Appellant's second point of error is overruled.

Appellant's final point of error complains of the admission of two instruments into evidence. One instrument was a letter from Davis to appellant dated October 28, 1974, containing the phrase "In connection with the purchase of the house here from Mr. Converse . . . ." The second instrument was a check dated October 28, 1974, payable to Davis and his partner, drawn upon their trust account apparently reimbursing them for certain expenses in connection with the sale, and bearing the notation "Converse to Carter." Appellant in her brief states that the objections were made on the grounds of remoteness, irrelevancy, and immateriality. Actually, the objection that was made was that the instruments were "inadmissible . . . as to any notice that may have been acquired after September 27, 1974."

The exhibits were offered by appellee's attorney while appellant's attorney was testifying. Appellant's attorney had testified that he never considered, nor indicated to appellant, that the sale was from Mr. Converse to her as opposed to a sale from Mr. Ellis to her. The exhibits were thus clearly admissible for impeachment purposes. Appellant could have made a limited objection, objecting to the exhibits' admissibility for purposes other than impeachment, but he failed to do so. Thus, he cannot now object to the admissibility of the evidence for general purposes. *Blum Milling Co. v. Moore—Seaver Grain Co.,* 277

S.W. 78, 81 (Tex.Com.App., 1925, jdmt. adopted); *Union Transports, Inc. v. Braun,* 318 S.W.2d 927, 934 (Tex.Civ.App., Eastland 1958, n. w. h.) and cases cited therein; *McEntire v. Baygent,* 229 S.W.2d 866, 868 (Tex.Civ.App., El Paso 1950, n. w. h.). The fact that these instruments were dated approximately twenty days after October 9, 1972 (the date on which the jury found that legal title passed) does not render them inadmissible on the grounds of remoteness. The executions of these instruments were done in continuance of or in winding up the transaction within reasonable proximity to the date title changed hands. Furthermore, the exhibits were similar to other instruments bearing the same or similar notations which were admitted into evidence, and are not attacked on appeal. There is a reasonable nexus among all the instruments such that these exhibits are not remote. Moreover, the question of remoteness of evidence is to a great extent within the discretion of the trial court. *Union Transports, Inc.,* supra; also see *Miller v. Alexandria Truck Lines, Inc.,* 273 F.2d 897, 79 A.L.R.2d 812 (5th Cir. 1960), opinion corrected, rehearing denied, 274 F.2d 942, 5 Cir. In any event, if the admission of the instruments complained of into evidence was error, in the light of the record as a whole, it is our opinion that the admission of such instruments did not probably cause and was not reasonably calculated to cause the rendition of an improper judgment. Rule 434, T.R.C.P.

The judgment of the trial court is affirmed.