GULF ATLANTIC LIFE INSURANCE
COMPANY, et al, Appellants,

v.

C. Daniel HURLBUT and A.C.
Hovater, Appellees.

No. 05–81–01363–CV.

Court of Appeals of Texas,
Dallas.

June 14, 1985.

Rehearing Denied Aug. 21, 1985.

Cousins & Irons, Strasburger & Price,
Dallas, Wagner, Schmidt, McCutchan,
Hank & Birkhimer, Columbus, Ohio, for
appellants.

Kelsoe & Kelsoe, R. Jack Ayres, Jr.,
Dallas, for appellees.

Before GUITTARD, C.J., and AKIN
and STEPHENS, JJ.

## SUPPLEMENTAL OPINION

GUITTARD, Chief Justice.

This opinion, which is not designated for publication, supplements the published opinion issued on this date, 696 S.W.2d 83, and concerns the evidence bearing on special issue number 27, which inquires whether plaintiffs "knew or by the exercise of ordinary care should have known of the fraud, if any, of the defendants on or before January 20, 1975." This opinion also discusses additional reasons for denying recovery on plaintiffs' disparagement and tortious interference claims.

### FRAUD

We sustain defendants' point of error asserting that plaintiffs knew or should have known of the fraud before January 20, 1975. We also sustain defendants' point asserting that the jury's negative finding in answer to this issue is against the great weight and preponderance of the evidence. Only the evidence from plaintiffs' own witnesses is summarized below, since the jury could legitimately reject the testimony of defendants' witnesses.

As licensed insurance agents, Hurlbut and Hovater knew that they were not legally permitted to sell group health insurance unless they were authorized to do so by a licensed insurance company that had obtained approval by the Texas Board of Insurance Commissioners (hereinafter referred to as the Insurance Board) of the policy form to be used. However, Hurlbut testified that it was normal to release the product for sale on verbal assurance from the Insurance Board that the policy would be approved. Plaintiffs knew that three steps were necessary before they were legally permitted to sell group health insurance through a trust plan: (1) a policy form had to be filed and approved by the Insurance Board; (2) a proper trust document had to be executed and delivered to the underwriter; and (3) a master policy had to be issued to the trustees.

Plaintiffs knew, or were charged with knowledge, that the first step, for which they were responsible, was never completed. Although plaintiffs testified that they had signed the trust document and turned it over to attorney Allen, there is no completed copy in evidence and no evidence that it was ever actually completed and delivered to Gulf Atlantic or the trustees as the basis for issuance of a master policy of group health insurance.

Plaintiffs contended at the trial that they relied on Gulf Atlantic's lawyer, Ira Allen, to draft the trust agreement and take care of it. However, the undisputed evidence shows that plaintiffs employed Allen and paid him for his services. Allen had represented Gulf Atlantic from time to time, but was not regularly retained by Gulf Atlantic. Plaintiffs do not assert that Allen was a party to the alleged conspiracy against them. When first approached by Hovater, Allen inquired of defendant Ralph Curtis whether Gulf Atlantic had any objection to his doing this work for plaintiffs. Curtis had no objection. The only copy of the proposed trust document in evidence appears to have been drawn for the signatures of James Dalton as individual trustee, the Franklin Bank of Houston as corporate trustee, three unnamed individuals designated as an "advisory board," and two administrators. The name of Gulf Atlantic Life Insurance Company does not appear. Although the agreement purports to be "effective June __, 1974," the only signature appearing is that of the Franklin Bank's president, dated January 17, 1975, but the agreement provides that it is effective as to the bank only when countersigned, and no countersignatures appear. For his services, Allen rendered two statements to Hovater, which plaintiffs paid.

A letter from Allen to Hovater dated July 3, 1974, states that his redraft of the document is enclosed, and plaintiffs testified that they signed it and sent it to Allen, but Allen testified that he never saw a copy signed by plaintiffs. There is a subsequent

letter from Allen dated November 8 concerning a similar document to be filed in Missouri. This letter indicates that the Missouri trust had not been completed and had not been signed by Dalton, the individual trustee. This letter suggests that Hovater send the trust document to Gulf Atlantic "to make sure that they will approve it for the purpose of issuing the policy to the trustees." In January Allen sent Hovater a proposed indemnity agreement requested by Dalton and also sent Hovater a copy of the proposed Nation–Wide Health Insurance Trust agreement, apparently the one in evidence, to be signed for the Franklin Bank. This proposed trust agreement also names Dalton as individual trustee. Hovater obtained the signature of the bank president on January 17. Allen had telephone conversations with Hovater on October 31, January 7, and January 13, but the contents of these conversations were excluded on plaintiffs' objection that they were privileged communications between attorney and client.

The proposed trust document requires plaintiffs as administrators of the trust to deposit premiums collected with the trustee bank, which is authorized to pay out the funds in accordance with the provisions of the document, but no trust bank account was ever established because, as Hovater testified, Allen advised plaintiffs that they could not do so until the trust document had been completed. Hovater admitted that, instead, plaintiffs deposited more than $300,000 in premium funds in their "Agency Associates" account, out of which they paid their expenses and personal drawing accounts, bought an automobile for Hovater's son, and even bought stock in an insurance company with funds lent by the bank and deposited in the same account.

■ Plaintiffs' contention that Allen was Gulf Atlantic's attorney rather than theirs is contrary to their claim of privilege as well as to their own testimony that they employed Allen and paid him for his services. Consequently, plaintiffs are charged with Allen's knowledge concerning the status of the trust document and cannot rely on Allen's failure to complete it as excus-

ing their own failure to make sure that it was properly executed and delivered. Knowledge or notice to an attorney acquired during the existence of the relationship of attorney and client, and while acting within the scope of his authority, is imputed to the client. *Carter v. Converse,* 550 S.W.2d 322, 329 (Tex.Civ.App.—Tyler 1977, writ ref'd n.r.e.) (knowledge that deed was given as mortgage); *Kemp v. Harrison,* 431 S.W.2d 900, 904 (Tex.Civ.App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.) (knowledge is imputed to client in absence of timely allegation that the attorney was party to conspiracy); *Whitsel v. Hoover,* 120 S.W.2d 930, 933 (Tex.Civ.App.—Amarillo 1938, writ dism'd); (attorney's opportunity to know truth or falsity of alleged fraudulent representation); *see also Wellington Oil Co. v. Maffi,* 136 Tex. 201, 150 S.W.2d 60, 63 (1941); (agent's knowledge imputed to principal). Moreover, plaintiffs' own evidence shows without dispute that plaintiffs themselves knew that the trust document had not been completed in August 1974 when they began collecting premiums, and at all subsequent times they also knew, or were charged with knowledge, that no trust document existed as a basis for a master policy to be issued by Gulf Atlantic to the Nation–Wide Health Insurance Trust.

Plaintiffs' evidence is similar with respect to the master policy and its approval by the Insurance Board. Plaintiffs knew that a master policy covering the beneficiaries of the proposed Nation–Wide Health Insurance Trust was necessary as a basis for the individual certificates that they provided for the insured employees, and they made a formal application for such a policy dated August 28, 1974. Nevertheless, they collected premiums, issued certificates of insurance, and paid claims from August through December without a master policy in hand and without anything in writing showing their authority to write group health insurance for Gulf Atlantic. All this time they were making "weekly" inquiries to Thompson and were accepting his repeated assurances that the policy would be forthcoming.

Whenever a school official or any other prospect inquired concerning the master policy, plaintiffs suggested that the inquiry be directed to Barnes or Thompson in Dallas. According to the testimony of Arthur Tipton, deputy superintendent of a school district near Houston, in September, after Hurlbut had made a proposal to his district for group health insurance, Tipton made a telephone call to Gulf Atlantic in Dallas and talked to Thompson, who advised him that Gulf Atlantic was "working on a program to help businesses and school districts provide coverage for their employees." However, Tipton did not testify concerning any specific representation by Thompson that Gulf Atlantic had underwritten the Nation–Wide Health Insurance Trust program.

Hurlbut testified that in late October or November he and Hovater were in Dallas with another school official from the Houston area, who wanted to "meet the folks" at Gulf Atlantic. They reminded Thompson that they needed the master policy. Thompson made a telephone call and then said that the policy was "on the corner of Bill Barnes' desk." Thompson assured them that the policy would be in their office when they returned to Houston, but it was not there when they returned, nor had they received it two months later. Allen testified that in November he talked with Thompson, who advised him that Gulf Atlantic was not going to underwrite Hovater's program under a trust plan. There is no testimony as to whether or not Allen relayed this information to plaintiffs, since plaintiffs objected to any conversation between them and Allen on the ground of the attorney-client privilege. Since Allen was thus admitted to be plaintiffs' attorney, his knowledge must be imputed to them according to the authorities above cited.

Plaintiffs also had strong reason to suspect that no proper policy form had been approved by the Board. Hovater testified that Gulf Atlantic's secretary, defendant Smith, had given them a copy of a policy filed for the "West Texas Pipe Trades Health Insurance Trust" and had assured them that issuance and approval of a similar policy for the Nation–Wide trust was "only a matter of paperwork." There is evidence that the West Texas policy was originally filed with the Board in July 1974 as a general form that might have been sufficient, if approved by the Board, to cover the necessary filing for the group policy to be issued to the Nation–Wide trust. This form, however, was not approved. With some changes it was filed again as a special purpose policy that was not broad enough to cover the Nation–Wide trust; as refiled, it was approved by the Board, but not until January 1975. Barnes admitted that Gulf Atlantic had sold insurance under this West Texas group policy before its approval in violation of the insurance laws. Hovater testified that in December Smith called him about the copy of the West Texas policy previously furnished and told him to "burn the son-of-a-bitch," but still assured him that plaintiffs' policy would be forthcoming. So far as the record shows, plaintiffs made no further inquiry as to whether there was any approval by the Board that would authorize their sale of group health insurance through the Nation–Wide trust.

The events leading to discovery of the alleged fraud were set in motion in late December, when Wayne Holder, city attorney of Freeport, made a telephone call to Barnes concerning a proposal plaintiffs had made for group health insurance coverage for Freeport city employees. Barnes told Holder that Gulf Atlantic was not underwriting the program. Holder also talked with Thompson, who made the same disavowal. Holder testified that he then called Hurlbut or Hovater and advised him that Gulf Atlantic was not underwriting the group health insurance program. Hurlbut admitted that Holder told him this. Since the city had paid more than $3,000 in premiums and its former coverage had expired, the city required plaintiffs to make a cash deposit of $10,000 to assure the city that coverage, plaintiffs made applications for group health coverage to various carriers, and even borrowed $50,000 to pay for stock in an inactive insurance company in an attempt to find an ultimate underwriter for the program, because, according to

Hurlbut, they knew that Barnes had refused to underwrite it. Finally they obtained coverage for the Freeport city employees from California Western Life Insurance Company. An internal memorandum from plaintiffs' file dated December 31, 1974, and signed by Hurlbut, relates plaintiffs' difficulties in obtaining coverage for the city of Freeport, which had been declined by Gulf Atlantic, but had finally been accepted by Cal West. The memorandum also notes Holder's complaint that plaintiffs had misrepresented their proposal to the city of Freeport. This complaint, according to a letter signed by Hurlbut, was the subject of a visit by William Gibson, an investigator for the Insurance Board, on January 8 or 9.

After Holder made his complaint, Hurlbut had a call from Thompson, who said he had a problem and "needed time to get things straight," but assured Hurlbut that Gulf Atlantic's attorneys "had enough muscle in Austin to clear this thing up." Thompson asked for a letter stating that Gulf Atlantic had never agreed to underwrite the program. Hurlbut refused, but did sign a letter dated January 1, 1975, ostensibly directed to all of plaintiffs' agents and brokers engaged in the Nation-Wide trust program, as follows:

> To all brokers: During the initial implementation of our overall group program, there was some discussion concerning the possibility of Gulf Atlantic Life underwriting group health benefits. In order to avoid any confusion or misunderstanding, you are reminded that our current agreement with Gulf Atlantic is limited to salary savings (cancer, hospital indemnity, etc. [sic]) with such agreement limited to standard Gulf Atlantic company policy.

This letter goes on to state that group health coverage would be placed with other carriers and that any claim forms bearing Gulf Atlantic's name should be replaced. According to Hurlbut, although he signed this letter, it did not state the truth and was not sent to any of the brokers, but was delivered by Hovater to Thompson in person. Hurlbut did not explain whom he expected to be deceived by this false information except to say that he got the impression that Thompson was concerned about his position with the company. Thus, plaintiffs had reason to suspect that Thompson had differences with his superiors concerning Gulf Atlantic's underwriting of the Nation-Wide group insurance program.

On January 10 Hurlbut wrote Thompson requesting authority to collect premiums on cancer policies for Gulf Atlantic, pointing out that other types of insurance written for the same policyholders, including "group health," would be covered by other carriers. The letter does not mention the Nation-Wide trust, nor does it refer to any group health coverage by Gulf Atlantic. Attached to this letter is a "suggested letter" for Thompson's signature authorizing Agency Associates to remit premium payments "on approved Gulf Atlantic salary savings" by checks payable to Gulf Atlantic. Thompson refused to sign the letter. On about January 15, Hovater had an interview with Thompson's superior, defendant Curtis, who pounded on the desk and said, "We don't want anybody collecting any premiums or paying any claims or doing anything with our money."

Despite plaintiffs' knowledge that Thompson's past assurances of their authority to write group health insurance for Gulf Atlantic through a trust plan were false, plaintiffs testified that they continued to believe that their authority would be confirmed. Hovater testified that he expected defendant Warner of Nationwide Corporation to intercede with Barnes so that something could be worked out. Hovater insisted that what Barnes had told others did not bother him so long as Gulf Atlantic did not tell him that they were not underwriting the program. On January 17, when he asked the Franklin Bank to sign the trust document, he thought that he and Hurlbut were "not completely through" with Gulf Atlantic although plaintiffs were "still struggling trying to get them to cooperate with us." He recognized that he and Hurlbut were in a "desperate situation," but assumed that Gulf Atlantic was as desperate as they were. He thought that

Gulf Atlantic was still working on the program and continued to believe that a master policy would be forthcoming even after legal proceedings were commenced against them, since defendants had never repudiated their assurances to him and Hurlbut.

■ In the light of this evidence, we sustain defendants' third point asserting that the jury's answer to special issue number 27 should be disregarded and hold that the evidence establishes as a matter of law that plaintiffs knew or should have known of the falsity of defendants' representations more than two years before the suit was filed.

■ Defendants also assert in their fourth point that the jury's answer to special issue number 27 is against the great weight and preponderance of the evidence. This point also is sustained. If, by any interpretation of the record, it may be said that there is some evidence raising a fact issue concerning whether plaintiffs discovered or should have discovered that they had relied on false representation of their authority more than two years before filing suit, nevertheless, that answer is against the great weight and preponderance of the evidence, which establishes that plaintiffs knew that Thompson had been deceiving them concerning their authority continuously from June or July, when he told them to "start selling" group health insurance, until mid-January, when he obtained from them a false statement that their authority to represent Gulf Atlantic was limited to cancer insurance and other types of individual insurance policies. Plaintiffs' professed refusal to believe that Gulf Atlantic was not underwriting the program after learning of Barnes' statement to Holder, and, indeed, even after hearing Gulf Atlantic's denial from Barnes' own lips on January 21, can be explained by plaintiffs' realization that they had been writing unauthorized insurance since August and could be saved from the consequences of their violation of the law only if Warner would intercede with Barnes and persuade him to proceed with the program as originally represented to them by Thompson and Smith. The evidence shows that in fact, plaintiffs no longer relied on defendants' assurances, even before the meeting on January 21, but did everything they could to obtain another underwriter—even to the point of buying an insurance company—after learning that Gulf Atlantic would not underwrite the program. Consequently, without giving any weight to defendants' testimony that they had never made any such representations or given any such assurances, we hold that the jury's answer to special issue number 27 is so contrary to the overwhelming preponderance of the evidence as to be manifestly wrong.

## DISPARAGEMENT AND INTERFERENCE

■ In addition to the grounds of limitation and privilege discussed in our published opinion, other reasons are presented for denying recovery on plaintiffs' disparagement and interference claims. Defendants moved for judgment on the ground that all of plaintiffs' damages resulted from action taken by public officials and present that argument here. We agree. There is no evidence that Barnes' statements to Holder or Flanary caused any damages other than such damages as may have resulted from the later receivership, license revocation proceedings, and criminal prosecutions. The authorities we have studied support the view that such ensuing damages cannot be made the basis of an action. In *Runge v. Franklin*, 72 Tex. 585, 10 S.W. 721, 724 (1889), a suit had been brought by minority stockholders against a corporation for an injunction and the appointment of a receiver, alleging that the affairs of the corporation were fraudulently conducted with consent and approval of the directors. After dismissal of the suit against the corporation, one of the directors sued the former plaintiffs for libel based on the allegations in the earlier suit and also on repetition of those allegations in a newspaper. In addition to holding that the allegations in the former suit was absolutely privileged, the supreme court held that the newspaper publication could not be the basis for an independent cause of action because there was no allegation of the amount of dam-

ages resulting from the newspaper publication alone. 10 S.W. at 725.

*Runge* was followed in *Ward v. Gee*, 61 S.W.2d 555, 557 (Tex.Civ.App.—Eastland 1933, writ dism'd), where the claim was for "business disparagement" rather than personal defamation. Ward sued to establish his ownership of a business operated by Gee, and Gee counterclaimed for damages, alleging impairment of his credit by Ward's false claim of ownership made to third persons before the suit was filed. A judgment for Gee on the counterclaim was reversed on the ground that Gee had failed to show that the impairment of credit resulted from Ward's false statements to third persons rather than from the suit itself. The court said that there was no right of action for filing the suit, which was privileged, and held that since the same claims were made in the suit as in Ward's statements to third persons, Gee had the burden of showing that the statements to third persons, independently of the effect of the prosecution of the suit, were the proximate cause of the damages claimed, but that on this point no evidence was presented. Likewise, in the present case, no evidence was presented of any damages caused by defendants' statements to third persons, as distinguished from the damages resulting from later legal proceedings.

We conclude that the rule established in *Runge* and *Ward* applies with equal or greater force when the legal proceedings causing the damages were filed and prosecuted by other parties. So applied, the rule bars recovery here, both for the statements made to Flanary and those made to Holder. Even though the proceedings may have been brought on the basis of false information given to Flanary as well as Holder, defendants are not liable for the ensuing damages without proof of the amount of damages caused by such statements independently of the subsequent proceedings or else proof of the elements of a cause of action for malicious prosecution.

Moreover, so far as this record shows, the subsequent legal proceedings were brought on adequate grounds apart from any false statements by defendants to Fla-

nary and the Insurance Board. If Barnes had made no such false statements, the fact remains that plaintiffs had sold more than $300,000 of group health insurance without any master policy approved by the Insurance Board. This was the ground on which their licenses were revoked and also the ground on which the receiver was appointed. The present record does not show the evidence presented to the Board, but the Board's order is presumptively valid and cannot be attacked in this suit in absence of a claim of malicious prosecution. Because plaintiffs knew that they had sold unapproved insurance, they had no alternative but to agree to the receivership, which was necessary to avoid or minimize losses to the policyholders. The Harris County indictments charged misapplication of premium funds, and we have no information concerning the evidence before the grand jury. Defendants, so far as we know, did not testify. Whether plaintiffs' actions which led to these proceedings were induced by defendants' false representation to plaintiffs may be relevant to their fraud claims, but these representations have no bearing on their disparagement claim. Consequently, we hold that plaintiffs have failed to establish any causal relation between the disparaging statements alleged and the damages found by the jury.

## CONCLUSION

We have had to give this case more than ordinary attention because of the wide disagreement between counsel concerning the facts shown by the record. Counsel for plaintiffs, although entitled to draw all permissible inferences in favor of the verdict, have gone beyond permissible bounds in presenting inferences as evidence and, in some cases, have made assertions about the facts not supported by evidence before the jury. Counsel for defendants, though faced with an adverse verdict, have presented the facts from the point of view of defendants and their witnesses, ignoring, for the most part, the contrary testimony which the jury chose to believe. Under these circumstances our labors have been prolonged and our attention has been diverted from the controlling questions of

law. For the reasons stated, we conclude that plaintiffs' petition reveals on its face that plaintiffs have no right to recover on any of the claims asserted and that the case should never have been submitted to the jury.

Defendants' points seventeen through twenty-nine complain of alleged errors that would require remand for a new trial. Although some of the points raise serious contentions, we do not reach them because of our decision to reverse and render.

For the reasons stated in this opinion as well as in our published opinion of this date, the trial court's judgment is reversed, and judgment is here rendered that plaintiffs take nothing against any of the defendants.

AKIN, J., dissents.